## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

## O & G SPRING AND WIRE FORMS SPECIALTY COMPANY, Defendant.

### No. 85 C 9966.

United States District Court, N.D. Illinois, E.D.

March 20, 1992.

Mary B. Manzo, Trial Atty., Jean P. Kamp, Supervisory Trial Atty., and John C. Hendrickson, Regional Atty., Chicago, Ill., for plaintiff.

Gerard Smetana of Richman, Lawrence, Mann Greene & Smetana, and Andrew William Levenfeld of Levenfeld & Associates, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

This court has previously ruled in favor of plaintiff, Equal Employment Opportunity Commission (the "EEOC"), in the liability phase of this Title VII pattern and practice race discrimination action. The matter is now back before the court for rulings on the damage phase. After the parties had briefed the damage phase, but before the court had ruled, the Seventh Circuit handed down its decision in *EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292 (7th Cir.1991), which in many respects is factually similar to this case. The court asked the parties to brief the issue of whether *Chicago Miniature* required any modification of the court's previous rulings in this case. The parties have now done so. After reviewing these briefs, the court will make no change in the Findings of Fact and Conclusions of Law in the liability phase as a result of the decision in *Chicago Miniature*.

### Chicago Miniature

In *Chicago Miniature*, as here, the trial court found in favor of the EEOC on a pattern and practice disparate treatment claim based mainly on statistical evidence. The Seventh Circuit reversed the disparate treatment claim because the EEOC had failed to prove discriminatory intent. The statistics the EEOC relied upon were seriously flawed because they misidentified the relevant labor market. The district court had concluded that the relevant labor market was the City of Chicago and thus it compared the hiring rates of blacks and non-blacks of Chicago Miniature with the percentage of black entry level workers in the City of Chicago during the relevant periods. Thus, Chicago Miniature was held liable because there was a relatively small percentage of blacks in its applicant pool as compared to the percentage of entry level black workers in Chicago. The appeals court ruled that this analysis was faulty because considerations of "applicant preference" were ignored by the trial court. Interest in the jobs at issue, it held, is an important consideration for proof of a Title VII pattern and practice case. 947 F.2d at 301–302. Specifically, the trial court did not consider commuting distance and language fluency requirements as factors in the relevant labor market. 947 F.2d at 302. The court pointed out that low paying, unskilled jobs were more likely to be filled by those living closer to the site of the job. It also pointed out that Chicago Miniature's lack of an English fluency requirement would make the jobs there especially attractive to certain non-black ethnic groups. 947 F.2d at 302–303.

Here, however, the EEOC did not ignore commuting distances. The EEOC's expert, Pierre de Vise ("de Vise"), relied on statistics, including the percentages of black machine operators in an one mile radius of O & G Spring and Wire Forms Specialty Company ("O & G"), and in the eight zip codes surrounding O & G, weighted by the percentage of applicants to O & G actually residing in the respective geographic areas. Thus, de Vise was in a position to compare the actual applicants and hires of O & G with the labor market consisting of a geographic area where O & G's applicants and employees actually resided. Also, unlike in *Chicago Miniature*, de Vise used a category of "black machine operators" for comparisons rather than "black civilian work-

ers." 947 F.2d at 303. Further, Chicago Miniature had a record of employing blacks in positions in question which O & G did not have. No matter what the relevant labor market might be determined to be, under all labor markets testified to had substantial numbers of blacks in them. Finally, this court did in previous orders, and does in this order, take into account the foreign language factor which the court in *Chicago Miniature* did not do. *See* FF No. 37 and *supra*.

### Proposed Final Order

The EEOC has filed a proposed final order granting relief. O & G has filed numerous objections to this proposed final order. The court has considered the arguments of counsel on both sides, and the precedent of *Chicago Miniature*, and has determined that it must make some specific findings with respect to the extent of the discrimination and the extent of the wages lost to the discriminatees.

### The Black Hiring Shortfall

The court was not satisfied with the statistical evidence of either party as it related to O & G's black hiring shortfall. The court found that the jobs in question at O & G were low-skilled kick and punch press operators where past experience, while desirable, was not necessary. (FF No. 10). The court further found that two specific employment practices were responsible for the statistical deviation between O & G's percentage of black employment and that of the relevant labor market. The specific employment practices were recruitment by word-of-mouth and walk-in hires. (Memorandum Opinion, Jan. 26, 1990, 732 F.Supp. 72, 73–74). The court found that the EEOC failed to carry its burden of persuasion that O & G's business justification for recruitment by word-of-mouth was pretextual. (Memorandum Opinion, Jan. 26, 1990, p. 73). The court, however, found that O & G's walk-in hiring practice, because it resulted in zero black hires, constituted a pattern and practice of disparate treatment and its arguments to the contrary were pretextual. *Id.*, p. 74. It was O & G's inability to explain this "inexorable zero" of black employment that sealed its

fate in this respect, particularly because many of its hires were walk-ins and not word-of-mouth hires. However, the court did not quantify the exact black employment shortfall due to O & G's pattern and practice of employment discrimination because such a specific finding was not necessary at the liability phase.

O & G admits, and the evidence justified, the court's finding that approximately two-thirds of the hires during the relevant time period were walk-ins off the street, and approximately one-third of the hires were the products of word-of-mouth recruitment. (Memorandum Opinion, Jan. 26 1990, p. 73). Since all punch and kick press operators at the beginning of the period in 1979 were white, in all probability the word-of-mouth recruits at the beginning of the period would also be white. However, the walk-in applicants would be expected to mirror the racial makeup of the relevant labor market. The data from the available applications indicate that this was, indeed, the fact. (Memorandum Opinion, p. 73). However, had O & G hired black walk-ins as expected, word-of-mouth recruitment would have begun to extend to blacks. In fact, this is what appears to have happened after 1985. (FF No. 40, n. 1).

Therefore, the court finds that the statistical evidence should be applied as follows to determine the black hiring shortfall. For the time period in question (1979 through 1985), O & G hired 87 people for the jobs at issue. Approximately two-thirds, or 58, would have resulted from walk-in hires and one-third, or 29, resulted from word-of-mouth recruitment. O & G should have hired blacks from the walk-ins at the rate of 22½ percent (de Vise's most conservative estimation of the number of blacks in the relevant labor market (FF No. 24)). Twenty-two and one-half percent of 58 equals thirteen.

Since blacks would have been gradually added to the O & G work force during this period through non-discriminatory walk-in hiring, black employees would have been expected to participate in the word-of-mouth recruitment as did other employees (and blacks themselves in 1986 and 1987).

If blacks had been hired at a uniform rate of 22½ percent during the period of 1979 through 1985 (the period when no blacks were hired), an average of 6.5 blacks would be working in any year (the mean between zero in 1979 to 13 in 1985). Since the average number of employees at O & G during the years 1981 through 1985 was 47 (FF No. 9), 6.5 blacks would constitute 14 percent of the work force during this period (6.5 divided by 47). Therefore, it follows that 14 percent of the 29 word-of-mouth hires, or 4 hires, should have been black. Therefore, the court finds that the black hiring shortfall for the time period of 1979 through 1985 is 17.

### Calculations of Back Pay

■ The EEOC proposes that the back pay award should be calculated by taking the total value of wages and fringe benefits actually earned by the 87 hires during the period commencing October 22, 1982 through the present, multiplied by the black hiring shortfall percentage. The court and O & G, however, disagree. The EEOC proposal fails to credit O & G with "interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against" as required by Section 706(g).

The EEOC's proposal apparently assumes that none of the discriminatees would have been able to get work elsewhere during the period in question. The EEOC's own employment and unemployment figures contradict this. The court believes that a proper credit for O & G can be determined with reasonable approximation, without conducting the individualized hearings demanded by O & G, by utilizing the average black unemployment rate for the relevant labor market during the back pay period. This would assume that each of the discriminatees would suffer unemployment during the period of discrimination equal to that of the class. The percentage unemployment rate for a class means that at any one time that percentage of the class is unemployed, or stated another way, the class members are unemployed a percentage of the time equal to the black unemployment rate. This should not be unfair to the class because the entry level wages and fringe benefits offered by O & G are so close to the very bottom of the economic barrel that the chances that a discriminatee would have obtained substitute employment at wages higher than that offered by O & G is quite high. Say the average unemployment rate for the class was 20 percent, during the back pay period the award should be equal to 20 percent of the EEOC's figure, i.e., the total wages of the 87 hires times the black shortfall percentage times 20 percent.

If the court would proceed to identify each of the discriminatees as urged by O & G, of course the credits could be determined with greater accuracy. However, the EEOC has asked the court to eschew identification of individual claimants (with good reason) in favor of a class-wide recovery with a pro rata distribution of the damages to members of the class. The court agrees that 450 claimants for 17 spots makes a pro rata distribution without individual determinations preferable (see below). But this makes precise determination of the credits impossible.

### Pro Rata Distribution

■ Because of the large number of applicants (451 for 17 spots) responding to the published notices compared to the available employment opportunities, the EEOC urges the court to order a pro rata distribution to the class of claimants. O & G, not surprisingly, urges the court to engage in a case-by-case method of the determination of the proper claimants. The court sides with the EEOC for the reasons stated in *EEOC v. Chicago Miniature Lamp Works*, 640 F.Supp. 1291 (N.D.Ill.1986), reversed on other grounds 947 F.2d 292 (7th Cir.1991). Here, as in *Chicago Miniature*, the entry level jobs at issue required only minimal qualifications. (FF No. 10). So it cannot be said with certainty which individuals would have been hired absent discrimination. Individual entitlement hirings would be a "quagmire" in which guesswork would predominate and pinpointing of actual discriminatees would be practically impossible. The court will, therefore, order pro rata distribution of the money award.

### Prejudgment Interest

 The EEOC asks for prejudgment interest compounded monthly from the period from October 22, 1982 to the date judgment is entered in this case. Prejudgment interest is a normal incident of relief in Title VII cases. *Loeffler v. Frank*, 486 U.S. 549, 108 S.Ct. 1965, 1971, 100 L.Ed.2d 549 (1988); *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 819 (7th Cir.1990). In fact, O & G does not raise an objection. The court does order prejudgment interest, but compounded annually rather than monthly for convenience sake. The interest rate is to be the IRS adjusted prime rate. *EEOC v. O'Grady*, 857 F.2d 383 (7th Cir.1988).

### Hiring of Discriminatees

The EEOC asks the court to order O & G to hire 20 black persons over the period of the next four years pursuant to suggested procedures. O & G insists that it should only be made to hire those who applied during the window period, and have either technical training or previous spring company experience. However, under the procedures suggested by the EEOC, O & G is given free rein to compile a list of acceptable employees from the 451 applicants so long as it does so on a non-discriminatory basis.

However, the court feels that the number to be hired should be 17, the shortfall number found by the court, less the number of blacks hired by O & G since 1985 in excess of the percentage of blacks in the relevant labor market. Assuming O & G has bent over backwards to hire blacks since the EEOC filed this suit, as the EEOC and the court believe (FF No. 41), this means that O & G has been discriminating in favor of blacks and against whites. The non-black labor market should not be further penalized.

### Other Provisions

The court approves of the other provisions of the proposed final order granting relief submitted by the EEOC.

### CONCLUSION

The parties are directed to present evidence of the average unemployment rate for blacks in the relevant labor market for the period from 1982 to the present for purposes of calculating the back pay award in accordance with this Memorandum Opinion. The case is set for status on Tuesday, April 21, 1992 at 9:00 a.m.

IT IS SO ORDERED.